E-FILED
Thursday, 19 May, 2016 12:42:05 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| FREDDELL BRYANT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 3:15-cv-2158 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Petitioner Freddell Bryant has filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (d/e 1).  Bryant is serving three consecutive sentences of life imprisonment, having been convicted by a jury of using a firearm to murder three people during a drug-trafficking crime.  He asks the Court to vacate his sentences.

## I.  Background

On April 4, 2007, Bryant was indicted for conspiring to distribute cocaine and crack cocaine; possessing 500 or more grams of cocaine with intent to distribute; possessing a firearm in furtherance of a drug trafficking crime; possessing a firearm in

furtherance of a drug conspiracy; and possessing a firearm as a felon.  See United States v. Bryant, Case No. 2:07-cr-20043, C.D. Ill. Apr. 4, 2007.

On March 24, 2009, Bryant signed a "cooperation and testimony" agreement with the Government and pleaded guilty to three of the offenses charged in the 2007 indictment.  Pursuant to the agreement, Bryant promised to "provide complete and truthful testimony to any grand jury, trial jury, or judge in any proceeding in which [Bryant] may be called to testify."  Cooperation Agreement, United States v. Bryant, 2:07-cr-20043, C.D. Ill. Mar. 24, 2009 (Doc. 62 at 20-21) (emphasis removed).  The agreement warned that Bryant's immunity from prosecution depended on his "complete compliance" with the cooperation agreement.  Id. at 21.

Pursuant to the cooperation agreement, Bryant met with the Government in January and February 2010 and admitted that he had been involved in a triple homicide on March 25, 2007.  At the January meeting, Bryant confessed to shooting and killing all three of the victims, but in February he changed his story and said that he himself had killed only one of the three victims.

On March 24, 2011, Bryant was called before a grand jury in

state court in Vermilion County, Illinois, to testify about the triple
homicide.  Bryant refused to testify, invoking his Fifth Amendment
right against self-incrimination.

The following month, in April 2011, Bryant was again called to
testify, this time in front of a federal grand jury.  But Bryant
informed the Government that he did not intend to testify before the
federal grand jury, either.  On April 6, 2011, the district judge
appointed an attorney, Jon Noll, to represent Bryant regarding his
grand jury testimony.

After meeting with his attorney, Bryant reiterated his intention
not to testify in front of the grand jury.  The Government gave
Bryant until May 3, 2011, to change his mind.

On May 3, 2011, Bryant appeared before the grand jury and,
as promised, refused to testify.  The Government then wrote
Bryant's attorney a letter informing Bryant that, because he had
willfully violated the 2009 cooperation agreement, the cooperation
agreement was voided.  May 4, 2011 letter, United States v. Bryant,
2:11-cr-20034, C.D. Ill. Sept. 14, 2012 (Doc. 16-2).  The
Government told Bryant that it was now entitled to use Bryant's
confession in support of a criminal prosecution against Bryant.

In July 2011 the Government charged Bryant with three counts of using a firearm to commit murder during a drug-trafficking crime. A jury convicted Bryant on all three counts, and the district judge sentenced Bryant to three consecutive life sentences.

Bryant appealed, arguing that the district judge erred in allowing the Government to use Bryant's 2010 confession against him. But the Seventh Circuit rejected Bryant's argument and affirmed the judgment and sentences.

## II.    Discussion

18 U.S.C. § 2255 allows a person convicted of a federal crime to vacate, set aside, or correct his sentence. It is an extraordinary remedy, because a Section 2255 petitioner has already had "an opportunity for full process." Almonacid v. United States, 476 F.3d 518, 521 (7th Cir. 2007). Post-conviction relief under Section 2255 is therefore "appropriate only for an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Harris v. United States, 366 F.3d 593, 594 (7th Cir. 2004) (internal quotation omitted).

### A.    Timeliness

Absent circumstances not present here, a Section 2255 motion must be filed within one year of the date on which the judgment of conviction became final.  28 U.S.C. § 2255(f)(1).  A judgment of conviction becomes final when the time expires for filing a petition for certiorari with the Supreme Court.  Clay v. United States, 537 U.S. 522, 525 (2003).  The deadline for filing a petition for certiorari is 90 days after the Court of Appeals enters its judgment.  S. Ct. R. 13(1).  Here, the Seventh Circuit entered its judgment on April 17, 2014, and so Bryant's judgment became final on July 16, 2014—giving Bryant until July 16, 2015 to file his Section 2255 motion.

Bryant's motion did not reach this Court until July 28, 2015.  But a prisoner's Section 2255 motion is considered "filed" for statute of limitations purposes when it is submitted to the proper prison authorities for filing.  Jones v. Bertrand, 171 F.3d 499, 502 (7th Cir. 1999).  Here, Bryant has declared under penalty of perjury that he gave his motion to the prison authorities on July 13, 2015.  Because no evidence refutes this claim, the Court finds that Bryant timely filed his motion.

### B.   Bryant's motion on the merits

Bryant argues that the Court should vacate his sentences because his attorneys before and during his trial provided such ineffective assistance that Bryant was deprived of his Sixth Amendment right to counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 684-86 (1984) (Sixth Amendment guarantees criminal defendants effective assistance of counsel).  Under <u>Strickland</u>'s familiar two-part test, Bryant must show both that his attorney's performance was deficient and that he was prejudiced as a result. <u>Vinyard v. United States</u>, 804 F.3d 1218, 1225 (7th Cir. 2015).

To satisfy the deficiency prong, Bryant must show that his attorney's representation "fell below an objective standard of reasonableness."  <u>Id</u>.  Scrutiny of an attorney's performance in the context of a Section 2255 motion is highly deferential, so as to "eliminate as much as possible the distorting effects of hindsight." <u>Id</u>.  The Court "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Id</u>. (internal quotation omitted).

To satisfy the prejudice prong, Bryant must "establish a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different."  Id. at 1227
(internal quotation omitted).

Here, Bryant argues that his attorneys provided ineffective
assistance in three ways.  For the reasons below, the Court rejects
Bryant's arguments.

### 1. Bryant did not receive ineffective assistance of counsel relating to his grand jury testimony.

Bryant first argues that his attorney Jon Noll provided
ineffective assistance in connection with Bryant's grand jury
testimony in 2011.  The district court had appointed Noll to
represent Bryant after the Government sought to have Bryant
testify in front of a federal grand jury in 2011.  Bryant says that
after consulting with Noll he followed Noll's advice and refused to
testify.  Bryant says that the Government informed him that
refusing to testify was a breach of his cooperation agreement, but
that neither the Government nor Noll told Bryant that refusing to
testify would result in Bryant's being charged with the three
murders in federal court.  Bryant says that he was told only that
his refusal to testify "void[ed] the cooperation agreement in its
entirety and release[d] the United States from any obligation under

the agreement," and that only upon being charged with the murders did "the reality of the breach of the agreement bec[o]me evident to Bryant" (d/e 1-1 at 15) (internal quotation omitted).

Bryant says that based on Noll's advice he believed that "all statements made by him [in 2010] were protected ... and could not be used against him nor could new charges be filed based on those statements" (d/e 1-1 at 15), and that he had no obligation to continue cooperating with the Government pursuant to the cooperation agreement after he was sentenced in his 2007 federal case on April 29, 2010.  Had the "exact repercussions" been explained, Bryant says, he "would have never refused to testify" before the grand jury (d/e 1-1 at 15-16).  Bryant says that Noll should have told him that not testifying could result in federal murder charges, but instead Noll told him only that "his testimony was protected by the terms of the plea agreements" (d/e 1-1 at 16).

Bryant argues that Noll's performance constituted ineffective assistance of counsel in violation of the Sixth Amendment.  See Strickland v. Washington, 466 U.S. 668, 687 (1984) (ineffective assistance claim requires showing that "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed ... by the Sixth Amendment ... [and] counsel's errors were so serious as to deprive the defendant of a fair trial"); <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 383 (1986) ("a single, serious error may support a claim of ineffective assistance of counsel").

But numerous documents contradict Bryant's account of what Noll told Bryant.  On April 22, 2011, Noll wrote to Bryant and advised Bryant that refusing to testify could result in additional criminal charges relating to the 2007 triple murder:

> It was a pleasure meeting with you on Thursday, April 21, 2011.
>
> ... [I]t is our understanding that you do not wish to testify further on any matter presently pending before the grand jury.  We believe that the testimony that would be elicited would deal with the triple murder in Danville, which we discussed yesterday.
>
> **The government has the capability to require your testimony under the cooperation agreement previously executed by you.**  The question remains as to how long that cooperation agreement was intended to remain in full force and effect.  Undoubtedly, the government will state that the agreement is open-ended.  Our position is that it terminated once you were sentenced by the court and the time for appeal elapsed.
>
> As your attorney, **we must recommend that you testify before the grand jury.**  The downside to refusing to testify by exercising your rights under the Fifth

Amendment may mean that **the government seeks to entangle you, in some way, into the triple murder case.** Possibly that could be by way of a gun charge under Section 924(c) or under some type of drug conspiracy charge. We see very little 'downside' to your testimony. However, **there could be problems that arise if you refuse to testify. Those we discussed with you yesterday and you seemed to understand that very well.**

(April 22, 2011 letter from Noll, d/e 5 at 9-10 (emphasis added).)

Bryant subsequently appeared before the grand jury, on May 3, 2011. During Bryant's (brief) testimony, the Government's attorney confirmed Bryant's understanding that, in the Government's view, Bryant's refusal to testify constituted a breach of the cooperation agreement and would allow the Government to use Bryant's previous statements against him:

Q: Okay. I'm just going to show you what's been marked as Grand Jury Exhibit FB Number 3 …. I'm going to refer your attention to paragraph 3 which states "He agrees to provide complete and truthful testimony to any grand jury, trial jury, or judge in any proceeding in which he may be called to testify by the United States." Do you see that paragraph?

A: Yes.

Q: And on page 4 of that agreement doesn't that contain the signature of both your attorney at the time, Robert Rascia, and your signature?

A: Yes.

Q:  And that was signed back on March 24th of 2009?
You have to answer out loud.

A:  Yes.  Yeah.

...

Q:  And my understanding is from talking with your
attorney [Noll] is that it's your intention not to testify here
today and to invoke your Fifth Amendment right against
self-incrimination?

A:  Yes.

**Q:  And you understand that pursuant to the
agreement that that's a violation of the agreement?**

**A:  I guess.**

Q:  Okay.  And you understand the United States's
position is that by violating the agreement, then **any
previous statements you made could be used against
you**?

A:  I don't know.

Q:  I mean did you talk to your attorney about that?

A:  Sort of.

Q:  The fact that your prior statements could be used
against you?

A:  Sort of, yes.

Q:  Okay.  I just want to make clear you understood our
position was that **by refusing to testify that your prior
statements could be used against you.  Do you**

**understand that?**

A:  **I guess, yeah.**

(May 3, 2011 Grand Jury Tr., d/e 5 at 16-18 (emphasis added).)

After Bryant refused to testify before the grand jury, Noll wrote

to Bryant:

> [W]e met with the Assistant United States Attorney and are uncertain as to what, if any, further action they will take on your case.  We must assume that they will proceed forward to file charges under 18 U.S.C. § 942(g), a copy of which we previously provided to you.
>
> **If you change your mind and desire to testify in order to avoid additional charges, please contact our office immediately.**  Although we may disagree with your action, we will stand by your refusal to testify and represent you accordingly.

(May 5, 2011 letter from Noll, d/e 5 at 11 (emphasis added).)

Noll wrote to Bryant again the following day:

> We received the enclosed letter [from the Government]. … **Obviously, [the Government] intends to proceed forward in prosecuting you for some type of offense.**
>
> … Should you wish to change your mind and testify before the grand jury, we may be able to reverse this prosecutorial momentum.  Although, we are not 100% sure that that could be done.

(May 6, 2011 letter from Noll, d/e 5 at 12 (emphasis added).)

On May 23, 2011, Noll again wrote to Bryant:

> It was a pleasure meeting with you on Thursday, May 19 …. As we stated to you then, and reiterate now, **we are extremely concerned that your refusal to testify before the grand jury possibly could result in additional charges being brought against you**. Although we recommended that you testify fully and completely before the grand jury, we understand your decision and will stand by you in that regard.  However, should you change your mind anytime in the meantime, please immediately advise our office.

(May 19, 2016 letter from Noll, d/e 5 at 13 (emphasis added).)

The letters from Noll to Bryant demonstrate that Noll advised—indeed, exhorted—Bryant to testify before the grand jury and warned that failing to do so raised the prospect of additional criminal charges relating to the 2007 triple murder.  And the transcript from Bryant's testimony before the grand jury confirms that Bryant understood that his refusal to testify constituted a breach of the cooperation agreement and that Noll specifically warned Bryant that failing to testify could result in Bryant's previous statements being used against him.  In short, the record undercuts the very premise of Bryant's ineffective assistance claim and reveals that Bryant refused to testify <u>despite</u> his attorney's advice, not because of it.

Bryant replies by arguing that Noll's April 22, 2011 letter

actually supports <u>Bryant's</u> position.  Bryant argues that one sentence in Noll's letter—"Our position is that [the cooperation agreement] terminated once you were sentenced by the court and the time for appeal elapsed" (d/e 5 at 9)—shows that Noll misled Bryant.  But Bryant ignores the rest of the letter, which in fact described an ongoing <u>dispute</u> about whether the cooperation agreement remained in effect and advised Bryant to testify in light of that uncertainty:

> The government has the capability to require your testimony under the cooperation agreement previously executed by you**.  The question remains as to how long that cooperation agreement was intended to remain in full force and effect.  Undoubtedly, the government will state that the agreement is open-ended.**  Our position is that it terminated once you were sentenced by the court and the time for appeal elapsed.
>
> **As your attorney, we must recommend that you testify before the grand jury.**  The downside to refusing to testify … may mean that the government seeks to entangle you, in some way, into the triple murder case. … **We see very little "downside" to your testimony. However, there could be problems that arise if you refuse to testify.** …

(April 22, 2011 letter from Noll, d/e 5 at 9-10 (emphasis added); <u>contrast</u> Sworn Affidavit of Freddell Bryant, d/e 1-1 at 38 ("I was continually advised … that [the] cooperation agreements were

terminated upon my sentencing on April 29, 2010 in the first Federal case.").)

Bryant argues that it is "contradictory in nature" for Noll's April 22 letter to simultaneously advise him: (a) that the cooperation agreement terminated upon sentencing; and (b) that he should testify because the agreement is no longer in effect (d/e 11 at 2).  But that is not what the April 22 letter says.  Far from advising Bryant that the cooperation agreement had terminated, the letter instead: (a) warns Bryant that despite Noll's view on the cooperation agreement the Government will "[u]ndoubtedly" argue that the agreement remains in effect; and (b) advises Bryant to testify in light of that uncertainty (d/e 5 at 9).

Perhaps recognizing that the April 22 letter does not support his position, Bryant also "adamantly denies" that the four letters from Noll were ever sent to him (d/e 11 at 1).  Bryant suspects that the letters have actually been written "in hindsight" in an effort to discredit the allegations in Bryant's Section 2255 motion (d/e 11 at 2).  In support of this speculation, Bryant points to the fact that the letters were not sent by certified mail and have not been "authenticated" (d/e 11 at 3).  But, in fact, the letters have been

authenticated by Noll, who has signed an affidavit averring that he wrote the letters to Bryant on the dates at issue (d/e 5 at 2-3). Contrast Barrientes v. Johnson, 221 F.3d 741, 748 n.2 (5th Cir. 2000) (criticizing failure to provide affidavit authenticating certain documents); Weatherspoon v. Bouchard, No. 04-170, 2006 U.S. Dist. LEXIS 62833, *2 (W.D. Mich. Sept. 5, 2006) (criticizing failure to submit affidavit authenticating letter).

Bryant also argues that evidence of the letters' inauthenticity is the fact that, "interestingly enough," the letters "directly contradict[] … each and every point raised by Bryant," thereby providing evidence that they were written only recently in an effort to discredit Bryant's claims (d/e 11 at 5). But Bryant argues elsewhere in his reply brief that the April 22 letter supports Bryant's position that Noll advised that Bryant's responsibilities under the cooperation agreement terminated upon sentencing (d/e 11 at 3). Bryant cannot have it both ways: the letters cannot support Bryant's allegations partially while at the same time contradicting Bryant's allegations entirely.

Bryant also challenges Noll's affidavit, in which Noll avers that Bryant's memory is "mistaken," that Noll was "very concerned" at

the time that Bryant's refusal to testify would result in Bryant's facing additional charges, and that Noll does not believe Bryant was surprised by the additional charges because Bryant had been "alerted … on numerous occasions as to that very real possibility" (d/e 5 at 2-3).  Bryant argues that, in light of the inconsistency between his own affidavit and Noll's affidavit, the Court "must agree that there is an issue of material fact as to which party is telling the truth" (d/e 11 at 3).  The Court cannot, Bryant says, believe Noll's word over Bryant's simply because Bryant is a convicted felon. Taylor v. United States, 287 F.3d 658, 660 (7th Cir. 2002) ("It is not sound to say that in every conflict between a prisoner and a lawyer, the lawyer must be believed.").

But to describe the Court's inquiry here as weighing two competing affidavits—Noll's and Bryant's—is to inaccurately describe the record currently before the Court.  On the one hand, Bryant avers that Noll failed to advise him about the risks of refusing to testify before the grand jury.  On the other hand, Bryant's account is contradicted by: (1) Noll's affidavit; (2) the letters Noll wrote to Bryant; and (3) the transcript of Bryant's grand jury testimony.  Bryant has not challenged the veracity of the grand

jury transcript—indeed, he could not credibly do so—and that transcript shows that Bryant was aware, when he refused to testify, that the Government would respond by attempting to use his prior statements against him.  (<u>See</u> May 3, 2011 Grand Jury Tr., d/e  5 at 18 ("Q: Okay. I just want to make clear you understood our position was that by refusing to testify that your prior statements could be used against you.  Do you understand that?  A: I guess, yeah.").)  Noll's affidavit, Noll's letters to Bryant, and the transcript conclusively demonstrate that Bryant's version of events is inaccurate.

Indeed, the sole aspect of Bryant's ineffective assistance claim that the record does not refute is Bryant's argument that Noll did not specifically advise him about the risk of facing <u>murder</u> charges in particular.  (Sworn Affidavit of Freddell Bryant, d/e 1-1 at 40 ("had Mr. Noll advised me [of] the <u>*mere possibility*</u> that I could be charged with the triple homicides … I would have never refused to testify") (emphasis in original).)  But as Noll avers, the precise nature of the potential charges Bryant could face after refusing to testify was "by necessity" speculative (d/e 5 at 3).  And the record shows that Noll warned Bryant that refusing to testify could result

in Bryant's "entangle[ment]" in the triple murder case (d/e 5 at 10), that Noll implored Bryant to testify, and that Bryant knew that the Government would seek to use his prior statements against him if he refused to testify.  The record, in other words, conclusively shows that Bryant understood the risk he faced by not testifying.

Bryant also argues that Noll's release of the letters written to Bryant violates the American Bar Association's Model Rules of Professional Conduct.  See M.R.P.C. 1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent…"); M.R.P.C. 1.9(c) ("A lawyer who has formerly represented a client … shall not thereafter … use information relating to the representation to the disadvantage of the former client … or … reveal information relating to the representation …").  But the Rules specifically provide an exception allowing a lawyer to "respond to allegations in any proceeding concerning the lawyer's representation of the client."  M.R.P.C. 1.6(b)(5); see also M.R.P.C. 1.9(c) (allowing lawyer to use and reveal information when the Rules permit as much); accord Formal Opinion 10-456, ABA Committee on Ethics and Professional Responsibility, July 14, 2010 (under Rule 1.6(b)(5), lawyer may

disclose protected information if lawyer reasonably believes it necessary to respond to ineffective assistance claim).  And the federal courts have consistently held that "where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer."  Bittaker v. Woodford, 331 F.3d 715, 716 (9th Cir. 2003); see also United States v. Pinson, 584 F.3d 972, 978 (10th Cir. 2009) ("Given the ample, unanimous federal authority on point, we hold that when a habeas petitioner claims ineffective assistance of counsel, he impliedly waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim."); accord Garcia v. Zenith Elecs. Corp., 58 F.3d 1171, 1175 n.1 (7th Cir. 1995) ("the attorney-client privilege is generally waived when the client asserts claims or defenses that put his attorney's advice at issue"); Cary v. United States, No. 13-1529, 2013 U.S. Dist. LEXIS 179831, *2 (C.D. Ill. Dec. 23, 2013) ("other circuits have agreed that an ineffective assistance of counsel claim waives privilege regarding the communications put in issue"); Simmons v. United States, No. 10-C-1137, 2011 U.S. Dist. LEXIS 120118, *14-15 (E.D. Wis. Oct. 17,

2011) ("[I]t is well settled that a defendant claiming ineffective assistance of counsel puts communications between himself and his attorney directly in issue, and thus by implication waives the attorney-client privilege with respect to those communications.") (internal quotation omitted).

Bryant nevertheless argues that allowing Noll to assist the Government by providing protected client information "might potentially chill future defendants from fully confiding in their lawyers" (d/e 11 at 5).  The American Bar Association sees merit in this point.  See Formal Opinion 10-456, ABA Committee on Ethics and Professional Responsibility, July 14, 2010 ("allowing criminal defense lawyers voluntarily to assist law enforcement authorities by providing them with protected client information might potentially chill some future defendants from fully confiding in their lawyers").  With those concerns in mind, the ABA has advised defense lawyers not simply to provide client information directly to the Government when the defendant raises an ineffective assistance claim.  Id.  Rather, the more prudent course is to secure a judicial determination that such disclosure will not violate the attorney-client privilege.  Id.

Here, by all appearances, Noll sent client information directly to the Government without any judicial supervision.  In the future, the Court encourages the Government to file a motion for an order authorizing such disclosure.  See, e.g., Staszak v. United States, No. 15-20, 2015 U.S. Dist. LEXIS 94815 (S.D. Ill. July 21, 2015) (granting motion for order authorizing defense attorney to provide written response to Section 2255 motion) ("the 'most prudent course' for a defense attorney to take before disclosing confidential communications and other information—even if the attorney believed that a waiver of the privilege had clearly occurred—is to secure an administrative or judicial determination that the disclosure would not violate the attorney-client privilege") (quoting United States v. Evans, 113 F.3d 1457, 1468 (7th Cir. 1997)). Nevertheless, the Court concludes without hesitation that the information disclosed here was reasonably necessary to respond to Bryant's ineffective assistance claim.

### 2.     Bryant did not receive ineffective assistance of counsel relating to the alleged closing of the courtroom at the beginning of jury selection.

Second, Bryant argues that his trial attorneys rendered ineffective assistance in failing to object when the judge closed the

courtroom during a portion of jury selection.

During jury selection at Bryant's trial, the judge faced a problem: the courtroom was not big enough to accommodate the 52 prospective jurors in addition to the members of the public who had gathered to watch the trial. To solve the problem, the judge instructed the audience members to wait outside of the courtroom while the prospective jurors sat in the courtroom seats to be sworn in. Bryant says that, to his memory, the courtroom did not reopen "until after the petit jury was selected and the jury discharged for the day" (d/e 1-1 at 20). This, Bryant says, "doomed [the trial] before it even began" (d/e 1-1 at 24). See Presley v. Georgia, 558 U.S. 209, 213 (2010) ("the Sixth Amendment right to a public trial extends to the voir dire of prospective jurors"); United States v. Negrón-Sostre, 790 F.3d 295, 299 (1st Cir. 2015) (complete exclusion of public during jury selection violated defendants' Sixth Amendment rights).

The trial transcript, however, reveals that Bryant's memory is incorrect. The trial transcript shows that the public was excluded only while the 52 prospective jurors were sworn in—not during the process of jury selection itself. After the prospective jurors were

sworn in, 32 of them moved into the jury seating area, freeing up space for the members of the public to return.  See Dec. 3, 2012 Trial Tr., United States v. Bryant, 2:11-cr-20034, July 25, 2013 (Doc. 93 at 39-40).

Indeed, the judge specifically told the members of the public that they could "come back in after we get all the [prospective] jurors … sworn and into the 32 [jury] seats," and that the members of the public would then "sit in that portion of the [public area of the] courtroom while the remaining [prospective] jurors sit in this portion [of the public area of the courtroom]." Id. at 39.  The judge specifically remarked, "[I]t's a public trial, but you [audience members] will be excluded from the trial for a short period of time before jury selection begins because we won't have enough room for everybody." Id. at 39-40 (emphasis added).

The jury selection transcript itself further refutes any suggestion that the public was excluded from the jury selection portion of the trial.  At the very beginning of jury selection, at 10:27 a.m., the judge said, "Fifty-two jurors have crowded into this small courtroom, displacing, as you came in, lots of students from the Illinois College of Law. … So as soon as you take the chairs in the

courtroom, they'll start coming in and taking the[ir] seats ..."  Dec.
3, 2012 Jury Selection Tr., <u>United States v. Bryant</u>, 2:11-cr-20034,
July 25, 2013 (Doc. 92 at 2).  At 10:30 a.m., the prospective jurors
were sworn in.  The deputy clerk then began calling out names of
the prospective jurors, and as the names were called the judge
directed the prospective jurors into the seats in the jury well of the
courtroom: 14 prospective jurors in "business class" leather seats,
and 18 prospective jurors in two rows of less comfortable seats that
the judge described as "sort of like an airplane."  <u>Id</u>. at 2-9.  When
the final four prospective jurors were called, the judge noted, "[D]o
we have enough seats ... or not?  I don't know which way to move
them. ... I don't want to cram them in too much, but we do have to
leave some room for the law students."  <u>Id</u>. at 8.  The judge then
devised a solution whereby the final prospective jurors would "fill in
over there and leave a section so I can stick the law students in
someplace; maybe in the back. ... And then you [prospective jurors]
can fill up the front row.  Okay.  I'm positive that will work.  Yep.
You can tell the law students to come in. ... [G]o ahead; bring them
in."  <u>Id</u>. at 8-9.  The court then began jury selection.  <u>Id</u>. at 9.
Moments later, after asking the prospective jurors a few preliminary

questions, the judge commented, "I've got to tell this story since we've got so many students from the University of Illinois College of Law. … I know we've got a lot of students here …" Id. at 14.

In sum, the trial transcripts show that the courtroom was not closed to the public during jury selection, and aside from his own allegations Bryant has not presented evidence to the contrary. Because the courtroom was not closed to the public during jury selection, no violation of Bryant's Sixth Amendment right to a public trial occurred. See United States v. Shryock, 342 F.3d 948, 974-75 (9th Cir. 2003) (in trial with limited seating due to number of defendants, lawyers, jurors, alternates, journalists, and audiovisual equipment, courtroom was not "clos[ed]" when there was insufficient seating for defendants' family members while jurors "received their questionnaires"); see also Riggins v. Rivard, No. 09-13144, 2015 U.S. Dist. LEXIS 61110, *21-22 (E.D. Mich. May 11, 2015) (rejecting public closure argument where petitioner did not "provide[] evidentiary support for his claim that he was denied a public trial during voir dire") ("the record at most indicates that the trial court admonished members of the public from repeatedly entering and exiting the courtroom").

And even if Bryant were correct that the temporary exclusion of the public from the courtroom while the prospective jurors were sworn in violated his Sixth Amendment right, the record would preclude a conclusion that Bryant's attorneys' failure to object fell below an objective standard of reasonableness.  The exclusion was extremely brief and was done for the logistical purpose of allowing the 52 prospective jurors to file into the courtroom and be sworn in before 32 of them moved to the jury well, making room for the members of the public to return.  Bryant's lead trial attorney, Jon Noll, avers that he viewed the judge's decision to briefly exclude the public as the prospective jurors entered the courtroom as "neither prejudicial nor unusual."  (Affidavit of Jon Noll, d/e 5 at 4.)  Noll adds that he has worked on other federal criminal trials during which "there have been instances in which courtrooms have been insufficient in size to accommodate all jurors and the public during jury selection," and that the judges in those cases "made the same decision" as the judge in this case.  (Id.)  Bryant's other trial attorney, Daniel Noll, concurs.  (Affidavit of Daniel Noll, d/e 5 at 21-22.)

Bryant's attorneys' views are reasonable, and likewise a

reasonable attorney would have perceived that Bryant's likelihood of receiving a not-guilty verdict would not increase as the result of an objection or a demand that the public be allowed to remain in the courtroom while the prospective jurors were sworn in.  This perspective is reinforced by the First Circuit's opinion in Bucci v. United States:

> [W]e think that competent defense counsel in this case could have reasonably concluded that **even a successful Sixth Amendment challenge to the partial courtroom closure would have done little to increase the defense's chances of securing a not-guilty verdict**.  As such, an objectively reasonable defense counsel could have made the strategic decision to forego the Sixth Amendment objection in favor of conserving the defense's limited resources for other important issues.  Rather than raising a complicated constitutional issue that might require briefing and a hearing while offering limited upside to the defendant, the defense counsel could have reasonably believed his client's interests would be best served by moving the trial along and focusing on the immediate task of jury selection.

662 F.3d 18, 32 (1st Cir. 2011) (emphasis added).  The public's minutes-long exclusion while the prospective jurors were sworn in did not present such a risk of prejudice to Bryant that this Court could find that Bryants' attorneys' failure to object fell below an objective standard of reasonableness.

Moreover, even if Bryant's attorneys' failure to object did fall

below an objective standard of reasonableness, Bryant has not even alleged that the result of his trial would have been different if his attorneys had objected.  See Taylor v. Bradley, 448 F.3d 942, 948 (7th Cir. 2006) (habeas petitioner "must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different") (internal quotation omitted).  Instead, Bryant argues that he need not show prejudice because a courtroom closure constitutes a "structural error" that does not require any showing of prejudice to the defendant (d/e 1-1 at 22).  See Judd v. Haley, 250 F.3d 1308, 1314-15 (11th Cir. 2001) ("a violation of one's right to a public trial is structural error .... once a petitioner demonstrates a violation of his Sixth Amendment right to a public trial, he need not show that the violation prejudiced him in any way"); Owens v. United States, 483 F.3d 48, 66 (1st Cir. 2007) (referring to closure of jury selection to public for entire day as "structural error"); United States v. Padilla, 415 F.3d 211, 219 (1st Cir. 2005) (structural error "transcends the criminal process ... by depriving a defendant of those basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no

criminal punishment may be regarded as fundamentally fair")
(internal quotation and alteration omitted); Sustache-Rivera v.
United States, 221 F.3d 8, 17 (1st Cir. 2000) (noting that if error
"did constitute structural error, there would be per [s]e prejudice,"
but finding error was not structural); Walton v. Briley, 361 F.3d
431, 432 (7th Cir. 2004) (petitioner not required to show prejudice
after showing he was denied public trial where government's case
had been presented after court was closed and locked for evening).

But in the cases Bryant cites that address the right to a public
trial, the courtroom either was closed entirely or was closed during
some substantive phase of the trial, such as jury selection.  Here,
by contrast, the public was excluded merely so that the 52
prospective jurors could file into the courtroom and be sworn in.
Once the first 32 prospective jurors made their way into the jury
well, the public was allowed back in, and jury selection began.
Contrast Owens v. United States, 483 F.3d 48, 63 (1st Cir. 2007)
("this was not a mere fifteen or twenty-minute closure; rather [the]
trial was allegedly closed to the public for an entire day").  The
courtroom was not, as Bryant alleges, closed during jury selection
itself.  Therefore, to succeed on his ineffective assistance claim

Bryant must show a reasonable probability that but for his attorney's failure to object the result of his trial would have been different. As noted above, Bryant has not so alleged.

To summarize: (1) the record conclusively shows that the courtroom was not "closed" during jury selection as Bryant alleges, and, therefore, Bryant's Sixth Amendment right was not violated; (2) even if Bryant's Sixth Amendment right were violated by the public's temporary exclusion as the prospective jurors were sworn in, Bryant's attorneys' decision not to object would not have been unreasonable; and (3) even if the decision not to object were unreasonable, Bryant has not alleged any prejudice that resulted from the decision.

### 3.   Bryant did not receive ineffective assistance of counsel in relation to the jury's question to the judge.

Finally, Bryant argues that his trial attorneys provided ineffective assistance by failing to object when the judge addressed a jury question outside of Bryant's presence.

During the jury's deliberations after closing arguments, the jury sent a note to the judge with a question about the jury instructions. The jury asked, "Please explain if – in [the criminal

statutes at issue] – the defendant must personally use and discharge the firearm to be determined guilty of murder?"  Dec. 10, 2012 Trial Tr., <u>United States v. Bryant</u>, 2:11-cr-20034, July 25, 2013 (Doc. 98 at 98).  The judge discussed with both sides' attorneys how to respond and ultimately answered the question, "Your question is answered:  No.  In continuing your deliberations on the verdicts, please refer to all the Court's instructions."  <u>Id</u>. at 103.

Bryant says that he was not present when the trial judge addressed the jury's question and that he had no opportunity to "confer with his counsel prior to the judge sending the note back to the jury" (d/e 1-1 at 29).  Bryant argues that his trial attorneys' failure to object to his absence constituted ineffective assistance. <u>See</u> <u>United States v. Degraffenried</u>, 339 F.3d 576, 579 (7th Cir. 2003) ("A criminal defendant has the right to be present at every stage of the trial. ... A judge's response to a note from the jury is one of those stages.") (finding harmless error where judge addressed jury note without defendant present).

As evidence that Bryant was not present when the judge addressed the jury's question, Bryant points to the fact that the

trial judge in general "was very thorough and methodic in clarifying [on] the record that Bryant was present at all critical stages of the proceedings and trial.  After every recess, the [judge] made sure that the record established that Bryant was present and ready to proceed" (d/e 1-1 at 25).  Before addressing the jury's question, however, the judge did not specifically note that Bryant was present.  Dec. 10, 2012 Trial Tr., <u>United States v. Bryant</u>, 2:11-cr-20034, July 25, 2013 (Doc. 98 at 98).  Bryant says that the proper inference from the judge's failure to recognize Bryant's presence before addressing the jury note is that Bryant was absent while the jury note was addressed.

But a full reading of the trial transcript does not support that inference.  The judge did regularly recognize Bryant's presence on the record and took pains to secure Bryant's presence in the courtroom at all stages of the proceedings.  <u>See</u>, <u>e.g.</u>, <u>id</u>. at 3-4 (delaying start of proceedings to wait for Bryant's arrival and criticizing Sheriff of Macon County for not producing Bryant on time).  And the judge did not identify Bryant as being present when the parties reconvened to address the jury's question.  But the judge—in contravention of his usual practice—did not identify

<u>anyone's</u> presence before addressing the jury's question.  Yet the transcript shows that others individuals were, of course, present in the courtroom, including the Government's attorney, Bryant's attorney, and a courtroom officer named Denny.  <u>Id</u>. at 98-104.  To believe that the sole time the judge did not identify who was present in the courtroom also happened to be the sole time that Bryant himself was absent is to draw an unwarranted inference from the record.  Bryant was present at 11:46 a.m., when the court recessed.  And he was present at 2:33 p.m., when the jury returned its verdict.  That very morning, the judge had harangued the Macon County Sheriff's Department for failing to bring Bryant to court on time.  And when the jury began deliberations, the judge admonished the parties to remain within 10 minutes of the courthouse so that they could return easily should the need arise.  There is no reason to infer that Bryant was absent at 1:59 p.m. when the parties reconvened to address the jury's note, and the mere fact that the judge failed to identify who was present in the courtroom before addressing the jury's note is not enough to warrant such an inference.

Bryant stresses that the record does not <u>prove</u> that he was

present when the judge addressed the jury note.  This is true.  But even if Bryant <u>had</u> been absent when the judge addressed the jury's question, Bryant's attorneys' failure to object would not have been objectively unreasonable.  The jury's question involved a legal issue, and a defendant's absence from a portion of the trial is harmless "if the issue involved is not one on which counsel would be likely to consult" the defendant or on which the defendant, if consulted, "would [not] be likely to have an answer that would sway the judge." <u>United States v. Degraffenried</u>, 339 F.3d 576, 580 (7th Cir. 2003) (internal quotation omitted).  Here, nothing suggests that Bryant's attorneys would have been likely to consult Bryant on the jury's question of law or that any views from Bryant on the issue would have changed the judge's answer to the jury's question.  <u>See Degraffenried</u>, 339 F.3d at 580 (court was not persuaded that defense counsel would have consulted defendant about jury note on a legal issue or that defendant's response would have swayed judge).  Indeed, Bryant himself had asked to be excused from an earlier conference on jury instructions so that he could have more time to prepare for his testimony.  Dec. 6, 2012 Trial Tr., <u>United States v. Bryant</u>, 2:11-cr-20034, July 25, 2013 (Doc. 96 at 278-79).

Therefore, even if Bryant had been absent when the judge addressed the jury's note, Bryant's attorneys' failure to object would not have been objectively unreasonable.

Further, Bryant has not even claimed that if he had been present his attorneys would have consulted with him or that he would have had anything to say that would have affected the judge's answer to the jury.  Therefore, even if the fact of Bryant's absence were conclusively proven, Bryant's ineffective assistance claim would still not succeed because Bryant has neither shown nor alleged a reasonable probability that the result of his trial would have been different but for his attorneys' alleged error.  Taylor v. Bradley, 448 F.3d 942, 948 (7th Cir. 2006) (habeas petitioner must establish reasonable probability that, but for counsel's unprofessional errors, result would have been different); see also Bryan v. Bobby, 114 F.Supp.3d 467, 538-39 (N.D. Ohio 2015) (right to be present not violated where trial court had answered nine jury questions outside habeas petitioner's presence, where questions mostly concerned "straightforward legal issue[s]" and petitioner "d[id] not explain … what he could have offered in responding to the questions that his attorneys failed to offer").

### 4. Because Bryant's attorneys did not err, the Court need not consider whether the cumulative impact of the alleged errors justifies vacating Bryant's sentences.

Bryant argues that, even if his attorneys' errors are not individually sufficient to warrant vacating his sentences, the "cumulative impact" of the errors is sufficient.  See United States v. Fernandez, 145 F.3d 59, 66 (1st Cir. 1998) ("Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect … so as to deny due process.") (internal quotation omitted).  But the Court has found that Bryant's attorneys did not err in the first place, so the Court need not consider whether the cumulative impact of any errors is enough to warrant granting Bryant relief.

### 5. An evidentiary hearing is not warranted.

Bryant argues that, at a minimum, the Court should hold an evidentiary hearing on Bryant's claims.  He focuses on Section 2255's direction that the Court should hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  "[M]any of the material allegations," Bryant says, "concern events which took

place outside the courtroom and are not, therefore, part of the 'files and records'" (d/e 1-1 at 32). An evidentiary hearing, Bryant argues, is required. <u>Virgin Islands v. Weatherwax</u>, 20 F.3d 572, 573 (3d Cir. 1994) (remanding for evidentiary hearing); <u>Stoia v. United States</u>, 22 F.3d 766, 773 (7th Cir. 1994) (remanding for evidentiary hearing because district court wrongly concluded that petitioner had waived claim); <u>Shaw v. United States</u>, 24 F.3d 1040, 1043 (8th Cir. 1994) (remanding for evidentiary hearing because record did not conclusively show petitioner was entitled to no relief).

First, with respect to Bryant's ineffective assistance claim regarding his attorney's grand jury advice, the Court finds that the record conclusively shows that Bryant's version of events is inaccurate: Bryant declined to testify despite his attorney's repeated warnings, not because of any bad legal advice.

Second, with respect to Bryant's ineffective assistance claim regarding the alleged courtroom closure: (1) the record conclusively shows that the courtroom was not closed during jury selection; (2) even if the public's temporary exclusion while the jury was sworn in did violate Bryant's Sixth Amendment rights, his attorneys' decision not to object did not fall below an objective standard of

reasonableness; and (3) even if the decision not to object had fallen below an objective standard of reasonableness, there is not a reasonable probability that the result of the trial would have been different if the attorneys had objected.

Third, with respect to Bryant's alleged absence when the judge addressed the jury note, an evidentiary hearing would not be warranted even if the record conclusively showed that Bryant had indeed been absent because Bryant has not alleged any prejudice resulting from his absence.

For these reasons, the Court declines to hold an evidentiary hearing on Bryant's claims.

## III.   Conclusion

Petitioner Freddell Bryant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (d/e 1) is DENIED for the reasons above.  Because Bryant has not made a substantial showing of the denial of a constitutional right, the Court also denies a certificate of appealability under Rule 11(a) of the Rules Governing Section 2255 Proceedings.  See 28 U.S.C. § 2253(c)(2).

This case is closed.

IT IS SO ORDERED.

ENTER:  May 19, 2016

FOR THE COURT:                    s/ Sue E. Myerscough
                                SUE E. MYERSCOUGH
                        UNITED STATES DISTRICT JUDGE